UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

_____

WILLIAM RICHARDSON                CIVIL ACTION NO. 02-1818-P

versus                            JUDGE WALTER

BURL CAIN, ET AL.                 MAGISTRATE JUDGE HORNSBY

_____

## REPORT AND RECOMMENDATION

**Introduction**

A Caddo Parish jury, presided over by Judge Eugene Bryson, convicted William
Richardson ("Petitioner") of the second degree murder of Warren Smith. Petitioner pursued
dozens of issues in the state court, and he now seeks federal habeas relief on several grounds.
When appropriate, Petitioner's issues are grouped and discussed by subject matter to avoid
unnecessary repetition of arguments and authorities. For the reasons that follow, it is
recommended that the petition be denied.

**Issue 1: Sufficiency of the Evidence**

Petitioner argues that the evidence at trial was not sufficient to prove his guilt of
second degree murder, which is generally defined as the killing of a human being when the
offender has specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1.
Petitioner argues that proof of specific intent was lacking and that the evidence showed only
an accidental shooting that could, at best, support a manslaughter conviction.

There were three eyewitnesses to the shooting of Warren Smith, which happened at Petitioner's home. Robert Hayes, Petitioner's nephew, testified that he was on a neighbor's porch two doors from Petitioner's home at the time of the shooting. Robert said that the two men (Petitioner and Smith), who were best friends, were drinking together when they got into an argument about money. It seemed to Robert that Smith was going to start a fight with Petitioner, but Robert admitted that Smith never took a swing at Petitioner, and he never saw Smith with a weapon. Robert said he thought it was "just a little friendly argument" and was looking away when he heard the fatal shot fired. He saw Petitioner jump off the porch and approach Smith, turn him over and check his pulse. Petitioner then started crying and saying, "I just killed my best friend." Petitioner asked that someone call the police or 911. He then went to his sister's house. Police learned where Petitioner was and arrived at the sister's house several minutes later. Petitioner came out with his hands up and surrendered. Tr. 1287-1307.

Eldrick Hayes, another of Petitioner's nephews, testified that he was with Robert Hayes at the neighbor's house at the time of the shooting. He had seen Petitioner and the victim sitting around drinking for four or five hours before the shooting. Smith left for a while to drop off a car and returned on foot. Smith saw Eldrick and asked if Petitioner was at his home. Eldrick said "yes," and Smith said he was going there to "kick it back with his friend." Smith walked over to Petitioner's house and began knocking on the door, but the

music was loud, so he began beating on it harder. Petitioner came out and told Smith to stop beating on the door and get out of his yard.

Eldrick testified that Smith then got off the porch but stopped in the yard. Smith refused orders to leave the yard, so Petitioner came down off the porch, and an argument followed. There was some mention of money during the argument. At some point, Petitioner used his right hand to draw a handgun from his left side and, as he was coming up with it, he fired it. Eldrick testified that Smith did not have a gun and was not moving to attack Petitioner in any way or otherwise acting in a manner that would justify Petitioner in drawing a gun. He also testified that Petitioner said somebody should call 911. Eldrick went inside and called his grandmother. Petitioner was gone when he returned outside. Eldrick saw the gun only at the time of the shooting, but he described it as a large caliber revolver. Tr. 1416-32.

A third eyewitness was Adrianne Murff, Petitioner's neighbor, who was sixteen at the time of the shooting. Murff testified that she was hooking up her Nintendo when she heard an argument and looked out the window. She heard Petitioner tell the man he was arguing with to get off his porch. The man, who was holding a cigarette, left the porch, and "he was walking around to the porch and [Petitioner] had come behind him, turned him sideways and shot him in the head and the guy fell down." Murff testified that she never saw the victim with a gun, knife or any other object in his hand except a cigarette, and the victim did not make any movements toward Petitioner.

Murff testified that, after the shooting, Petitioner turned to people in the area and, sounding angry and upset, said to call "the thing" (which presumably meant 911 or the like). She then saw Petitioner go back in his house. Before the paramedics arrived, a "gay person" came walking down the street with some women. He checked the victim's pulse and said he was dead so there was no use calling an ambulance. Murff volunteered her information to the police and was interviewed at length at the station.

Murff admitted that she had been treated at Brentwood Hospital for suicidal thoughts and hallucinations of a man coming out of the wall. That hospitalization had been a couple of years after the shooting. Murff testified that she did not have the hallucination until after the shooting and that she was feeling fine on the day of her testimony. On cross examination, defense counsel got Murff to admit that such problems began when she was only 12 years old and that she had been hospitalized at Brentwood twice, including one time when police brought her to the hospital. Tr. 1450-95.

Police never recovered the gun Petitioner used to fire the fatal shot. Petitioner surrendered to police peacefully. He invoked his right to consult an attorney and did not give a statement or testify at trial.

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 99 S.Ct. 2781, 2789 (1979). The trier of fact has

broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts."  <u>Id</u>.

The state appellate court rendered the last reasoned decision with respect to sufficiency of the evidence.[1]  That court invoked the <u>Jackson</u> standard and engaged in a thorough discussion of the evidence submitted at trial and the elements of second degree murder.  The court focused on the testimony of three eyewitnesses that Petitioner and the victim were arguing immediately before the shooting.  Two of the witnesses made clear that the victim was not attacking Petitioner at the time, and all three witnesses agreed that the victim did not have a weapon at any time during the argument.  The court found that evidence sufficient for a jury, after assessing the credibility of the various witnesses and weighing the evidence, to find that Petitioner fired the shot with specific intent to kill or inflict great bodily harm.  This court may not grant habeas relief on this issue unless the state court's decision was an "unreasonable application" of the principles set forth in <u>Jackson</u>.  28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 120 S.Ct. 1495, 1523 (2000).

Petitioner points to Murff's mental problems and inconsistencies between her testimony about where the gun was aimed and the testimony of the medical examiner regarding where the bullet entered the victim's face. Petitioner also attacks Murff's testimony on grounds that it was inconsistent with other evidence at trial or statements that Murff made to police, but there was a full opportunity to explore those issues at trial, and many of them

---

[1] A copy of the decision by the Second Circuit Court of Appeal is among the loose exhibits found in Group 1 of the exhibits attached to the State's Answer at Doc. 11.

were tested during cross-examination. The jury heard all of the evidence, assessed credibility and weight, and rendered its verdict. The state appellate court applied the appropriate <u>Jackson</u> standard to review that verdict and found, correctly, that a reasonable juror could have, after viewing the evidence in the light most favorable to the prosecution, found the essential elements of second degree murder beyond a reasonable doubt. That court's decision is objectively reasonable (and supported by a thorough written analysis of the evidence and law). The sufficiency of the evidence issue is not a basis for this federal court to vacate the conviction on habeas review.

**Issue 2: Request for an Attorney**

Shreveport Police Corporal James Haacker testified that he arrested Petitioner. Haacker described how he approached Petitioner, handcuffed him, and "advised him of his rights and took him into arrest." Tr. 1343. The following exchange then occurred:

Q.      Did you ask him any other questions?

A.      After I advised him of his rights incident to arrest, I asked him, Where is the gun?

Q.      And, - -

Mr. Gold:      Never mind. No objection.

The Court:      OK. All right.

Q.      Then what happened?

A.      He said "I want my attorney, or I want an attorney."

Q.      And then what did you do subsequent to that?

> Mr. Gold: Now I have an objection and I have to ask the jury to be excused.

Tr. 1343-44. Defense counsel, Daryl Gold, moved for a mistrial on the grounds the testimony was analogous to a comment on Petitioner's exercise of his right to silence. The prosecutor responded that his question had been posed to follow up on the fact that the gun was never recovered despite the police taking all steps necessary and appropriate to find the gun. The prosecution suggested that the defense ask for a cautionary instruction if so desired, but defense counsel declined an admonition. Tr. 33-47. The testimony resumed, and the prosecutor immediately asked Haacker what he did after handcuffing Petitioner, which led to a repeat of the testimony that Petitioner asked for an attorney, and a repeat of the request for a mistrial. Tr. 1347-48.

The state appellate court found that the prosecutor had asked an open-ended question that did not appear intended to elicit testimony concerning Petitioner's refusal to give a statement. And, under Louisiana procedural law, the trial court had discretion to address any violation by granting a mistrial or admonishing the jury. That discretion was exercised and an admonishment was offered, but defense counsel declined an admonition. Finally, the appellate court found that any error was not reversible because the evidence of the Petitioner's guilt was considerable and the prosecution did nothing further to emphasize the silence or get the jury to make a negative inference based on the challenged testimony.

The prosecution's comments on post-<u>Miranda</u> silence or invocation of counsel may be a constitutional violation. <u>Doyle v. Ohio</u>, 96 S.Ct. 2240 (1976); <u>U. S. v. Moreno</u>, 185 F.3d

465, 472 (5th Cir. 1999) (addressing agent's comment on invocation of right to counsel).

Assuming a violation, habeas relief would not be available unless the error had "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 113 S.Ct. 1710, 1722 (1993). The Brecht harmless error standard has, in the Fifth Circuit, survived enactment of the AEDPA and applies even when the state court has not performed on direct review the more rigorous harmless error analysis made applicable by Chapman v. California. Robertson v. Cain, 324 F.3d 297 (5th Cir. 2003).

This is not a case where the prosecution used a defendant's post-Miranda silence to impeach an exculpatory story offered by the defendant at trial or where the prosecution has otherwise attempted to use the silence in a substantial way. Petitioner has not pointed to any additional mentions by the prosecutor of the invocation of an attorney or efforts to use that invocation during closing arguments. Given the substantial evidence of Petitioner's guilt and the relative insignificance of the challenged testimony, any Doyle error with respect to the testimony cannot be said to have had a substantial effect on or influence in determining the jury's verdict. Accordingly, any error was harmless and habeas relief is not warranted on this issue. See Brecht (infrequent references to post-Miranda silence were harmless in light of weighty evidence that shooting was intentional rather than accidental).

## Issues 4, 5, 6 and 7: Challenges for Cause

### A. Introduction

The Sixth Amendment guarantees the accused the right to a trial by "an impartial jury," and that right is applicable to the states through the Fourteenth Amendment and

principles of due process. <u>Ristaino v. Ross</u>, 96 S.Ct. 1017, n. 6 (1976). That guarantee entitles a defendant to a "jury capable and willing to decide the case solely on the evidence before it." <u>Smith v. Phillips</u>, 102 S.Ct. 940 (1982).

Petitioner argues that jurors Olive Gibson, Jusant Pular, Frank Bryan and Sharon Blocker should not have been permitted to serve on his jury and that the trial court erred in denying challenges to those jurors for cause. The question of an individual juror's partiality is one of historical fact. The trial judge's resolution of the factual issue is essentially one of credibility, which turns to a large degree on demeanor, and is entitled to "special deference" by reviewing courts. <u>Patton v. Yount</u>, 104 S.Ct. 2885, 2891-92 (1984). Prospective jurors, who may never have been subjected to the type of questions and tactics often employed during voir dire, cannot be expected invariably to express themselves carefully or even consistently. The trial judge is best situated to choose which statements were the most fully articulated or that appeared to have been the least influenced by leading questions or other tactics and assess the juror's credibility. <u>Patton</u>, 104 S.Ct. at 2893.

The degree of deference afforded state court factual determinations has been heightened even more since <u>Patton</u> described the "special deference" standard in 1984. Factual determinations by state courts, since the enactment of the AEDPA in 1996, are presumed correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless the decision is objectively unreasonable in light of the evidence presented in the state-court proceeding. § 2254(d)(2).

<u>Miller-El v. Cockrell</u>, 123 S.Ct. 1029, 1041 (2003) (applying that deference to <u>Batson</u> findings).

**B. Olive Gibson**

Olive Gibson testified during voir dire that she could vote to convict if the elements were proved beyond a reasonable doubt. She volunteered that she had been a probation officer for fifteen years and retired five years earlier. When asked if she would afford law enforcement officers more or less credibility than other witnesses, she said: "No, I don't think so." Tr. 1199, 1211. Defense counsel also asked if Gibson would give more weight and credibility to the testimony of a law enforcement officer. Gibson answered with a simple "no" and went on to give an equivalent response to a hypothetical question posed by counsel. Tr. 1215-16. She next agreed that the prosecution had the burden of proof and that the accused had the right to not testify at trial. She did opine that most innocent people want to protest if accused of wrongdoing, but she said she would not change the law on the issue if she could. Tr. 1225-27. She later said that her service as a probation officer would not make her lean more toward the state than the defense. Tr. 1231.

Defense counsel issued a challenge for cause based on Gibson's prior occupation and the possibility that she was familiar with Petitioner's criminal history (which had been ruled inadmissible at the current trial). The court pointed out the lack of evidence of such knowledge. After hearing lengthy arguments, the trial judge said that he had listened carefully to the voir dire. He then went on to give a detailed explanation of why he found Gibson was impartial and did not have prior knowledge of Petitioner. Tr. 1235-41. The state

appellate court found that the trial judge did not abuse his discretion. That factual determination was objectively reasonable and has not been rebutted by clear and convincing evidence to the contrary, so habeas relief is not permitted.

### C. Jusant Pular

Jusant Pular testified that he would not treat a police officer as more credible and that he believed police are capable of shading the truth. Tr. 1045-46. Pular later said that he believed if a person was pleading not guilty, the person should defend himself by taking the stand. Defense counsel then submitted some specific reasons that an accused person might not wish to testify, and Pular agreed that there were circumstances that would warrant a decision not to testify. Pular later stated that he believed an accused would likely say anything he needed to beat a case, but he added that the accused is the ultimate eyewitness and that he would "really listen to him and understand what he's saying detail to detail to come to that determination." Tr. 1060-63.

Counsel challenged Mr. Pular based on what he perceived was a problem Pular had with the presumption of innocence and the right of an accused to not take the stand. The court overruled the objections on the grounds that the follow-up questions in those areas rehabilitated the witness. Tr. 1072. The state appellate court found that this was not an abuse of discretion. Reasonable minds might have assessed Mr. Pular's testimony in a different way had they been present to observe the voir dire, but the trial judge who personally observed the proceedings made a decision that was not objectively unreasonable in light of the evidence presented.

### D. Frank Bryan

Frank Bryan, during questioning about the right of an accused to not testify, said that he "can't say this about everyone else" but offered that he "probably would have a tendency to not tell the truth" if he testified at his own trial. He added that he would defer to his attorney in that situation. When asked if he believed someone else would say whatever they needed to say to beat a case, he responded that he answered the best he could earlier and suspected that others would "probably think they would do pretty much the same thing." He agreed that it would not necessarily mean a person had something to hide if the person chose not to take the stand, and he volunteered that he would think the person was acting on advice of counsel. Tr. 1065-66.

The trial judge overruled a challenge for cause because he believed Mr. Bryan said only what he would do and not what other people would do. Tr. 1071. The appellate court found no abuse of discretion. The conclusion is perhaps debatable, but it is not objectively unreasonable in light of the evidence. Furthermore, a potential juror's answers during voir dire are intended to foster an open and honest exploration of the juror's views. They do not necessarily indicate the law or philosophy that the juror will apply to the case if selected, sworn, and charged in the law by the court. Mr. Bryan gave no indication that he would not follow the judge's instructions with regard to the burden of proof, assessing credibility, and the right of an accused to not testify. Habeas relief is not warranted.

**E. Sharon Blocker**

Sharon Blocker volunteered that her brother-in-law worked for the Sheriff's department and that the Shreveport Chief of Police was her next door neighbor whom she knew "pretty well." Another neighbor's son was a policeman. Tr. 1041-42. When asked if she would give more weight to a policeman's testimony than the testimony of a civilian, she answered, "I don't think so." She agreed that policemen were human like others and not vested with a higher power, but she said it was a "possibility" that she would afford a policeman's testimony more weight. Tr. 1047-48. The trial court denied Plaintiff's challenge, based in part on his recollection that Blocker had been talking about her assessment of the credibility of law enforcement officers she knew. Tr. 1070-71. The appellate court found no abuse of discretion. Once again, reasonable minds might interpret the comments on the cold transcript in different ways, but the trial judge's resolution of the challenge and the appellate court's affirmance of it was not outside the bounds of objective reasonableness.

In summary, there is no indication that Petitioner, as a result of any decisions by the trial judge on challenges for cause, was deprived of his constitutional right to an impartial jury capable and willing to decide the case solely on the evidence before it.

**Issue 10: Appearance Without Counsel**

Petitioner claimed on direct appeal, as Error No. 16, that the trial court denied him his right to counsel when he was brought before the court with only the prosecutors present. Petitioner contends that there is no transcript of this event, and he describes it as follows. On

the morning trial was to begin, Judge Bryson had deputies bring Petitioner from his cell. Petitioner entered the courtroom and saw the prosecutors at the bench speaking with the judge. The conversation ended when Petitioner entered the room, and the attorneys took their seats. The clerk called the case. The prosecutors announced that they were ready, and the judge said he had spoken on the phone with defense counsel, who said he was ready and would see Petitioner at 1:30. Petitioner was apparently returned to his cell until the later proceedings.

Once adversary judicial criminal proceedings have commenced, the accused is entitled to the presence of counsel at all critical stages of the prosecution. <u>Moore v. Illinois</u>, 98 S.Ct. 458, 462-65 (1977). The accused "is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." <u>U. S. v. Wade</u>, 87 S.Ct. 1926, 1932 (1967).

The momentary appearance alleged by Petitioner was not a critical stage of the prosecution. There was no presentation of evidence or other event at which counsel could have rendered assistance. Petitioner was not required to address the charges against him, and there was no reference to the event during the presentation of the case to the jury. For those same reasons, there was no prejudice to Petitioner. The state appellate court found no merit in this issue, and that decision was not objectively unreasonable.

**Issue 26: Admission of Clips/Ammunition**

The murder weapon was never recovered, but witnesses described the gun as a revolver. Corporal Jimmy Muller and another Shreveport policeman executed a search warrant for Petitioner's home. Muller testified that the only evidence seized was "two clips, two gun clips containing some live ammunition." Tr. 1353-54. Defense counsel later objected that "the information has been we're talking about (sic) a revolver and these are clips that obviously go in some kind of automatic." The trial judge overruled the objection. Tr. 1361. The state appellate court found that it was appropriate to introduce the results of the search and that it was not prejudicial to introduce gun-related items discovered in the home when Petitioner admitted that he shot Smith and the gun was never recovered.

Federal courts do not grant habeas relief based on mere errors in the application of state evidentiary rules or even consider it relevant whether state evidentiary rules were satisfied. Only federal constitutional errors that satisfy the demanding standards of Section 2254 merit habeas relief. The Due Process Clause provides a mechanism for relief when a state court wrongfully admits evidence, but only if the evidence is so unduly prejudicial that it renders the trial fundamentally unfair. Bigby v. Cockrell, 340 F.3d 259, 271-72 (5th Cir. 2003), citing Dawson v. Delaware, 112 S. Ct. 1093 (1992) and Estelle v. McGuire, 112 S.Ct. 475 (1991).

For this court to order relief, it must find that the state court performed an objectively unreasonable application of those principles. Petitioner has not demonstrated that the state courts were objectively unreasonable in their decision to admit the evidence. Reasonable

persons might disagree as to the relevancy or prejudicial effect of the evidence, but there is nothing inherent in the nature of the evidence or how it was used that rendered the trial fundamentally unfair. Even if constitutional error is found, a petitioner's claim will still fail absent a showing that the evidence had a substantial and injurious effect or influence in determining the jury's verdict. <u>Bigby</u>, 340 F.3d at 272. There is no basis for such a conclusion in this case.

**Issue 25: No Ruling on Pro Se Motions**

Petitioner complains that he filed approximately 80 motions, at least 20 of which were not ruled on prior to trial. The habeas petition describes only one such motion, a request for the jury to view the crime scene. Petitioner alleges that he complained to the trial court several times that his motions had not been addressed, and he even obtained mandamus relief from the appellate court ordering rulings on three motions.

Petitioner complained on direct appeal, in Assignments of Error 15 and 29, about the trial court's refusal to rule on each of his many motions. The appellate court noted that Petitioner was represented by at least six different attorneys throughout the majority of the trial court proceedings. There was only a three-month time when Petitioner was not represented by counsel, and he had standby counsel during at least two of those months. The court held that complaints about the pending motions were waived when trial proceeded without the issues being raised.[2]

---

[2] Petitioner made what the appellate court described as "paranoid and unproven accusations against each and every lawyer appointed to represent him," and Petitioner's dissatisfaction with his appointed attorneys resulted in him representing himself on direct appeal.

An indigent defendant has a right to counsel or the right to represent himself, but he has no constitutional right to be both represented and representative. <u>Faretta v. California</u>, 95 S.Ct. 2525 (1975); <u>State v. Bodley</u>, 394 So.2d 584, 593 (La. 1981). Louisiana courts have, based on that rule, held that when a defendant is represented by counsel the trial court is not required to consider the defendant's pro se motions. <u>State v. Greer</u>, 572 So.2d 1166, 1168 (La. App. 1st Cir. 1990).

Petitioner has not explained how the state court's resolution of this issue was contrary to or an unreasonable application of clearly established Supreme Court precedent, as required by Section 2254(d)(1) to merit habeas relief. Petitioner has also failed to set forth the facts that could establish prejudice stemming from this issue. In the alternative, the state court's decision rests on an independent and adequate procedural bar (waiver when trial commenced without objection) that precludes federal review absent a showing of cause and prejudice. <u>See</u> <u>Coleman v. Thompson</u>, 111 S.Ct. 2546, 2554 (1991)(describing procedural bar doctrine).

## Issue 9: Denial of Pro Se Motions

Petitioner also complains that the trial court denied several motions that he filed pro se. The motions included a demand that the sheriff provide pens and paper, a request that the court fund expert investigators in the fields of toxicology, forensic and pathology, a motion to prohibit the sheriff and prosecutor from interfering with Petitioner's pro se efforts to prepare a defense, and a motion to suppress. He contends that he raised the issues on direct appeal, but neither the appellate court nor Supreme Court addressed them.

Petitioner lists the many motions that he contends should not have been denied, but his argument focuses on what he contends was a scheme to permit the state to review his pro se legal papers. Petitioner alleges that the authorities falsely accused him of planning to murder the sheriff and other public officials so that they could obtain a search warrant that would allow them to review Petitioner's belongings, including his case file. Petitioner alleges that the prosecution used the information learned from those papers to help convict him. He has not, however, identified what confidential information the state gained from the search and how it was used at trial. Absent a factual basis that would indicate both a constitutional violation and prejudice, there is no basis for habeas relief.

With respect to the requests for appointed experts, the Supreme Court has not spoken clearly to when due process requires a court to appoint experts of the kind requested by Petitioner. It has held that due process may require appointment of a psychiatrist in a capital case when the need for psychiatric expertise is required with respect to an insanity defense or to rebut psychiatric evidence presented by the prosecution at the sentencing phase. Ake v. Oklahoma, 105 S.Ct. 1087 (1985). Soon afterwards, in Caldwell v. Mississippi, 105 S.Ct. 2633, 2637 n. 1 (1985), the Court noted but did not pass on the issue of whether and when an indigent defendant is entitled to non-psychiatric expert assistance. See also Johnson v. Oklahoma, 108 S.Ct. 35 (1987) (Marshal & Brennan, J.J., dissenting from denial of certiorari) (noting that the issue was yet to be resolved); and LaFave, Israel & King, 3 Criminal Procedure §11.2(e)(2d Ed.) (discussing the uncertainty in this area of the law).

The Fifth Circuit has projected that the Supreme Court would hold that due process requires the appointment of non-psychiatric experts, such as ballistic experts, only if the evidence is both critical to the conviction and subject to varying expert opinion. Even then, the government is not required to automatically provide the assistance upon demand; the defendant must request the experts and demonstrate something more than a mere possibility of assistance. Yohey v. Collins, 985 F.2d 222, 227 (5th Cir. 1993); Moore v. Johnson, 225 F.3d 495, 501-03 (5th Cir. 2000).

Section 2254(d)(1) mandates that this court is concerned only with whether the state court acted contrary to or unreasonably applied clearly established federal law as determined by the *Supreme Court*. Because the Supreme Court has not clearly established a rule that could have been violated in this case, the trial judge's denial of the request for defense experts does not permit relief. See Burgess v. Dretke, 350 F.3d 461, 467-69 (5th Cir. 2003) (appellate court decisions recognizing a right are insufficient for habeas relief if Supreme Court has not recognized the right). And "[i]t is not enough, under § 2254, that a Supreme Court case apply 'by extension' to a purported state court violation; the Supreme Court must speak clearly." Id. at 460.  But see Aguilar v. Dretke, 2005 WL 2529830 (5th Cir. 2005)(stating that habeas relief could be available for failure to appoint a ballistics expert if the Yohey factors are shown; not noting that Supreme Court has not clearly established a right to non-psychiatric experts). Also, Petitioner has failed to explain how any of the requested experts would provide testimony on an issue both critical to the conviction and subject to varying expert opinion. No relief is warranted on these issues.

**Issue 16 : Incomplete Record**

Petitioner complains that he was denied a right to appellate review based on a complete record because the trial court did not provide a complete and accurate record. He claims the missing material would have supported many of his other assignments of error. This was raised as Error No. 38 on direct appeal. The appellate court characterized Petitioner's arguments as "vague allegations of missing portions of the transcript" of a hearing on a motion for new trial. The court stated: "After reviewing the transcript in question, we can find no evidence that any of it is missing or has been altered." Petitioner has not presented specific facts to this court to indicate that the appellate court's finding was objectively unreasonable or that it otherwise affords a basis for federal habeas relief from his conviction.

**Issues 20 and 21: Closing Argument**

Petitioner complains that the prosecutor improperly commented on Petitioner's failure to testify. The Fifth Amendment generally forbids such comments by the prosecution. <u>U. S. v. Robinson</u>, 108 S.Ct. 864 (1988); <u>Griffin v. California</u>, 85 S.Ct. 1229 (1965).

The prosecutor began his closing argument by talking about how people have to accept responsibility for their actions. He contended Petitioner had failed to accept responsibility for his actions stemming from pulling a gun, pointing it at his friend's head and pulling the trigger. Tr. 1514-15. The theme of a need to accept responsibility was repeated in other parts of the argument. The prosecutor also asked: "Now what didn't you hear during this trial? You didn't hear a fulfillment of promises made to you in opening statements that

... ." Defense counsel objected at this point, the objection was overruled, and the prosecutor continued that the jury had not heard fulfillment of promises made by counsel in the opening statement that the victim (Smith) was smoking crack and "this good solid citizen" (Petitioner) said that he did not want Smith doing that at his house. The prosecutor conceded that the evidence showed Smith had cocaine in his system and a crack pipe in his pocket, but he argued that Smith had no actual rocks of crack and there was no other evidence that Smith was preparing to smoke crack at Petitioner's house. Tr. 1520. The prosecutor also faulted Petitioner for failure to telephone Smith's mother, a woman he had known for years, to tell her about the shooting. Tr. 1519.

Defense counsel moved for a mistrial on the grounds the argument was an indirect reference to the accused's failure to testify. The prosecutor responded that he was not referring to the accused's silence but *counsel's* unfulfilled promises made in his opening statement. The trial court denied the mistrial. Tr. 1524-26. The state appellate court found that the comments were on the strength of the state's evidence rather than a comment on the accused's failure to testify.

The state court's resolution of the issue is within the realm of reasonableness. Federal courts have permitted a closing argument that pointed out the failure of the defense to deliver on a promise made in opening statements. U. S. v. Zanabria, 74 F.3d 590, 592-93 (5th Cir. 1996). Accordingly, this issue does not warrant relief under Section 2254(d)(1). Furthermore, assuming error, Brecht would not permit relief unless that error had a

substantial and injurious effect or influence on the jury's verdict. 113 S.Ct. at 1722. The record does not support such a finding.

Petitioner also complains briefly about the prosecutor's apparently cynical reference to him as a "good solid citizen." The state appellate court found that this one-time remark "clearly" did not influence the jury in such a manner as to require that the verdict be reversed. For reasons similar to those expressed with respect to the other closing argument issues, this comment does not merit federal habeas relief.

**Issue 22: Appeal to Juror Sympathy**

Petitioner complained on appeal that the victim's mother cried when a picture of the victim was displayed during the prosecution's closing argument. The state appellate court rejected the issue on procedural grounds because no motion for mistrial was made in regard to the claim. This court need not consider the procedurally barred issue absent a showing of cause and prejudice. See Coleman v. Thompson, 111 S.Ct. 2546 (1991); Cardenas v. Dretke, 405 F.3d 244, 249 (5th Cir. 2004). The merits will nonetheless be addressed briefly.

The state appellate court, with respect to the picture that was shown the jury during closing argument, held that the picture was properly admitted into evidence and depicted the manner of death. Statements regarding the evidence were deemed within the proper bounds of closing argument under state rules. The court also found that the reference to the picture did not introduce any factor of passion, prejudice or arbitrariness. Petitioner has not demonstrated that the state court's decision was objectively unreasonable in light of any

clearly established Supreme Court precedent, that it deprived him of a fundamentally fair trial, or that it otherwise entitles him to have his conviction set aside.

**Issues 23 & 24 : Jury Instructions**

Petitioner was charged with second degree murder, which includes the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. A conviction is also appropriate if the offender is engaged in the perpetration or attempted perpetration of certain specified felonies even though he has no intent to kill or inflict great bodily harm. La.R.S. 14:30.1. A manslaughter conviction is appropriate when, among other situations, a homicide is committed without any intent to cause death or great bodily harm but the offender is engaged in the perpetration or attempted perpetration of a felony not enumerated in the first and second degree statutes. La.R.S. 14:31(A)(2)(a). The prosecution requested, and the appellate court ordered that the trial court deliver, an instruction that illegal use of weapons (which includes the criminally negligent discharging of a firearm) is a felony that may serve as a predicate offense for a manslaughter conviction absent proof of intent.

Defense counsel objected to the manslaughter instruction and to a felony-murder instruction on second degree murder. He argued that the prosecution had committed, since its opening statement, to a position that this was a specific intent crime and, therefore, the prosecution should be barred from obtaining a conviction on a theory that did not require proof of such intent. The trial judge denied the objection. Tr. 1509-12. The appellate court,

addressing Errors No. 21 and 36, recounted that it had ruled on the issue prior to trial and would not do so again.

An improper jury instruction may violate the constitution, but only if it "so infected the entire trial that the resulting conviction violates due process." Henderson v. Kibbe, 97 S.Ct. 1730, 1737 (1977). In a habeas proceeding, the burden of demonstrating that an erroneous jury instruction violates Due Process rights is "greater than the showing required to establish plain error on direct appeal." Id.

Petitioner has not shown that the court's instructions were contrary to state law or inconsistent with any constitutional rules clearly established by Supreme Court precedent. There is nothing inherently wrong with prosecuting based on a specific intent theory, with a felony-murder provision of the second degree murder statute as an alternative theory. See Duvall v. Cain, 116 Fed. Appx. 475 (5th Cir. 2004) (denying habeas attack on specific intent evidence when there was overwhelming evidence of guilt under the felony-murder provision). Petitioner has not established a basis for relief with respect to these issues.

## Issue 11: Vouching for Witness

Petitioner complains that the prosecutor improperly vouched for the credibility of key witness Adrianne Murff. The prosecutor, before making the argument attacked by Petitioner, was responding to defense counsel's attacks on Ms. Murff's ability to accurately see the facts to which she testified. The prosecutor made the point that the witness might not have been able to see the exact point where the body fell, but that did not mean she could not see the place where Petitioner was standing when he fired the shot. In the midst of that argument,

the prosecutor stated: "Yes, she's telling you the truth. And I think Mr. Gold concedes, she's not lying to you. He's just saying you can't trust her perceptions." The prosecutor went on to argue why those perceptions were supported by other evidence and trustworthy. Tr. 1546.

This issue was presented as Error No. 23 on direct appeal and addressed by the appellate court along with three related issues. The court did not address the vouching claim specifically, but it did generally find the prosecutor's closing argument to be appropriate and not a basis for relief.

A prosecutor may request that a jury draw reasonable inferences from the evidence, and he may present a bolstering argument if it is in rebuttal to assertions made by defense counsel in order to remove any stigma cast upon a prosecution witness. U. S. v. Thomas, 12 F.3d 1350, 1367 (5th Cir. 1994); U. S. v. Washington, 44 F.3d 1271, 1278 (5th Cir. 1995). A review of the challenged argument, in its overall context and considering the points to which the prosecutor was responding, shows that the prosecutor did not personally vouch for the credibility of the witness so as to imply that he had additional personal knowledge about the witness and facts to confirm her testimony, which is the danger to be avoided by the prohibition. See Washington, 44 F.3d at 1278. Habeas relief is not warranted on this issue.

**Issue 8: Hearing on Motion to Quash Indictment**

Petitioner complains that the trial court allowed the prosecution to interfere with his efforts to subpoena two members of the grand jury and a Caddo Parish commissioner for a hearing on a motion to quash the indictment. Petitioner alleged that the two grand jurors were biased due to one's friendship with the victim's family and the other having a possible

disqualification.  Petitioner wanted to question the commissioner about the pre-selection process to determine whether state law procedures were followed.

The right to indictment by a grand jury is found in the Fifth Amendment and is applicable in federal court, but the states are not required to afford an accused grand jury review before trial.  Hurtado v. California, 4 S.Ct. 111 (1884).  Even in federal court, a procedural violation in the grand jury process (other than racial discrimination in the composition of the grand jury) may be rendered harmless by the petit jury's conviction.  U. S. v. Mechanik, 106 S.Ct. 938 (1986).

Petitioner has not demonstrated that any alleged mistakes with respect to the subpoena of witnesses for the hearing on his motion to quash the indictment were of constitutional dimension that are cognizable on habeas review.  Issues of possible bias or technical disqualification of grand jurors would have been rendered harmless by the trial jury's finding of guilt beyond a reasonable doubt.  A similar point was made in Pickney v. Cain, 337 F.3d 542 (5th Cir. 2003), when an attorney's failure to file a motion to quash an indictment (issued on mere probable cause) did not undermine confidence in the outcome of the trial (where a legally chosen petit jury found guilt beyond a reasonable doubt).  With respect to the commissioner who was subpoenaed, Petitioner has not articulated in his petition what testimony would have been obtained from the commissioner and how the absence of that testimony prejudices him.

If Petitioner contends the commissioner's testimony was necessary to prove a claim of racial discrimination in the selection of grand jury foreman – a claim that was rejected on

direct appeal for failure to show under-representation – Petitioner has not articulated how the commissioner's testimony would have been relevant to that claim and how it could have made a difference in the outcome of the proceeding. Furthermore, the federal court has never found that Caddo Parish has a history of discrimination in the grand jury selection process.

**Issue 18: Jury Selection Procedure**

Petitioner complains that the trial judge, without a formal vote of all the judges or a written order, appointed his law clerk as judicial administrator and allowed her to select the trial jurors from the pool. Petitioner also complains that the court reporter certified the list of jurors when state law required that the certification be done by the clerk of court. Petitioner makes a related complaint that the jurors were chosen by having their names called from a list rather than having their names drawn from slips in a box.

Petitioner briefed these argument on direct appeal as Errors No. 4 and 11. His brief to the appellate court argued that the procedures ran afoul of provisions of the Louisiana Code of Criminal Procedure and that a local rule of the trial court violated state statute.[3] Petitioner also presented the issues to the Supreme Court of Louisiana in essentially the same format.[4] Petitioner did not invoke federal constitutional law as a basis for his challenge; the arguments rested solely on state statutory grounds.

---

[3] The appellate brief is located in Vol. 16 of the record. The pages in that volume are not Bates-stamped numbered consistently with the other volumes. The relevant portions of the appellate brief are found at pages 37-40 of the brief.

[4] Petitioner's application for writs to the Supreme Court of Louisiana is included among the loose documents in Vol. 1 of the sixteen volume state court record.

Petitioner now presents the claims in his federal petition as violating state law and constituting a denial of "due process rights," but a petitioner who presents his argument in state law terms in the state courts and attempts to convert it to a federal claim in a habeas petition has not properly exhausted his state court remedies with respect to the federal claim. Baldwin v. Reese, 124 S.Ct. 1347 (2004). The lack of exhaustion is a defense to granting relief on the newly raised federal claim. 28 U.S.C. § 2254(b). And federal habeas corpus relief is not available for mere errors of state law. Richmond v. Lewis, 113 S.Ct. 528, 536 (1992). The various jury selection mistakes Petitioner complains about are all rooted in state procedural rules, not federal constitutional guarantees. Furthermore, Petitioner has not pointed to a rule of law clearly established by the Supreme Court that was applied in an objectively unreasonable manner.

**Issues 3, 12 and 13: Jurors and Newspaper Article**

Petitioner had a prior conviction of attempted first degree murder of a Shreveport police officer in 1985. The state court ruled before trial that evidence of the conviction would not be admitted. Information about the prior crime was contained in articles published by the Shreveport Times newspaper on September 10 and 11, 1997. Petitioner complains that the "other crimes" evidence was erroneously introduced to the jury by the articles, that the trial judge did not conduct adequate individual voir dire about that exposure, and that the bailiff's communications with the jury were improper.

The trial judge, as he had done earlier, cautioned the jury before lunch on the first day of trial that they should not talk about the case with anyone or attempt any kind of

independent investigation and "avoid any kind of publicity whether it be the radio, television, newspaper accounts of the trial." Tr. 1319. After the jury left, defense counsel notified the court that an article in the morning paper mentioned the prior conviction. Counsel requested that the court "simply ask the jury if they read the paper this morning." The judge responded:

> "What I did when I saw some jurors did have a newspaper, we took the newspapers away and told them not to read the newspapers. That was my understanding. My bailiff has done that. There was a newspaper down in this area. We have retrieved that newspaper this morning. Apparently no one had, but if you want to question the jurors, we can do that ... ."

Tr. 1320. The court added that, "I've asked my bailiff to warn them not to read the newspaper" and had him take away the "Local" section of the paper that contained the article. Tr. 1320-21. One juror did have a "folded-up, unwrapped newspaper" that was taken, and the judge said he was "assured that paper had not been read." Tr. 1321.

When the jury returned from lunch, the judge stated,

> "Today there was an article in the 'Shreveport Times' dealing with this case. I want to know if any of you all read the article?"

The jurors all nodded "no." The judge then asked: "Did anybody even see it? Some saw it?" Some jurors then nodded "yes." The court then asked if anybody read the article and, again, all jurors shook their heads "no." The judge re-emphasized the instruction to avoid articles about the case. The attorneys were asked if they had "any questions or concerns about that." Defense counsel answered, "No, sir." The judge again cautioned the jury about exposure to news reports and asked twice more if anyone had "talked to" a juror about the article. And, finally, the judge stated: "For the record, all the jurors have affirmed that they have not read

the article, nor no one has talked to them about it.  Am I correct?  Ladies and gentlemen, is that correct to say?"  The jurors answered, out loud, "Yes."  Defense counsel was asked if he had anything else, and he said no.  The trial continued.  Tr. 1323-25.

Petitioner contended on appeal and argues in this court that the trial transcript is inaccurate or missing a portion that would show that some jurors raised their hands to indicate they had seen the article and that foreman Jody Blackwell said that he "saw the article but didn't read it."  The state appellate court considered the argument but concluded, "There does not appear to be any portion of the transcript that is missing."  Petitioner argued that a mistrial should have been granted, but the appellate court pointed out that no motion for mistrial was filed on this issue.  Furthermore, there was no showing that any jurors were so affected from seeing (but not reading) the article that they would have been unable to render a fair and impartial verdict.  The appellate court also rejected Petitioner's claim that the trial judge should have conducted individual voir dire of each juror to ascertain the extent of his or her knowledge about the article.  Petitioner claimed that three jurors admitted that they had the paper and saw the article, but the appellate court found: "This is simply not the case."  The record contained no evidence to back Petitioner's assertion. The court also rejected the complaint that the trial judge met with jurors outside of Petitioner's presence to discuss the newspaper issue.  The appellate court reasoned that the judge's statements that he had the newspaper taken away and was assured it had not been read did not reflect an improper meeting in violation of state procedural law.

In Mu'Min v. Virginia, 111 S.Ct. 1899 (1991), eight of twelve jurors answered on voir dire that they had read or heard something about the case, but none of them indicated that they had formed an opinion based on that outside information or that it would affect their ability to decide the case based solely on the evidence at trial. The defendant argued that the Constitution was violated because the trial judge refused to further question prospective jurors about the specific contents of the news reports to which they had been exposed. The Supreme Court, noting the great latitude a trial court retains in deciding the appropriate questions for voir dire, rejected the claim. The Court explained that questions about the contents of publicity to which a juror has been exposed might be helpful in assessing whether a juror is impartial, but to be constitutionally compelled the question must be more than helpful. Rather, the "trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." 111 S.Ct. at 1905.

The trial judge in this case conducted a thorough inquiry of the panel members about their exposure to the article. Not a single juror stated that he or she had actually read the article, despite the judge's rather pointed and repeated questions on the issue. The state court's actions cannot be described as an objectively unreasonable application of the principles of Mu'Min, nor can the trial be considered fundamentally unfair merely because the trial judge did not go even further and ask each individual juror the same questions he posed to the group.

With respect to the complaint about the bailiff communicating the judge's instructions to not read the newspaper, the Supreme Court has recognized that the "day-to-day realities

of courtroom life" include occasional unrecorded ex parte communication between the trial judge and jurors. <u>Rushen v. Spain</u>, 104 S.Ct. 453, 456 (1983). Even if such communications result in a constitutional violation, no relief is in order if the error was harmless. <u>Id</u>. Petitioner has not articulated any basis for prejudice stemming from the bailiff's communication of the judge's instructions. Petitioner's arguments that the transcript is inaccurate or incomplete lack supporting evidence, so there is no indication that the state court's resolution of that issue was incorrect.

**Issue 19: Self-Representation on Motion for New Trial**

Petitioner complains that his counsel rendered ineffective assistance in litigating his motion for new trial because counsel had an unspecified conflict of interest and a hatred for Petitioner. Petitioner complains, in particular, that counsel released witnesses from subpoena, stipulated to testimony from witnesses who did not appear, failed to view the crime scene, and the like. Petitioner also complains that the trial court denied him his right to represent himself at the hearing on the motion for a new trial. The complaints about ineffective assistance of counsel at the hearing are addressed elsewhere in this Report and Recommendation. This discussion will focus on the alleged right to self-representation at the hearing.

Petitioner filed a Motion to Remove Attorneys (Tr. 613-28) that contended trial counsel were in "collusion" with the prosecutor, refused to communicate with Petitioner to the extent he desired, treated Petitioner like a slave without a brain, conspired with the prosecutor, and committed other perceived wrongs. The lengthy motion closed with a

request that the attorneys be removed and Petitioner be allowed to proceed pro se with his supplemental motion for new trial. The district judge brought up the motion to remove during a hearing. A great deal of discussion then occurred between counsel, the court and Petitioner about obtaining the presence of a witness, what aspects of a motion for new trial counsel could endorse, and whether Petitioner might handle one aspect of the motion by himself. The judge ultimately ruled: "I do not see any basis whatsoever to remove counsel." Petitioner responded to the denial as follows: "I would object, Your Honor." Tr. 1606-13.

The accused has a constitutional right to represent himself at trial if he makes a clear and unequivocal request to do so and then makes a knowing and voluntary waiver of his right to counsel. Faretta v. California, 95 S.Ct. 2525 (1975). The Fifth Circuit has strictly construed the "clear and unequivocal" requirement of Faretta, and mere complaints about counsel or requests to remove them are not sufficient. Burton v. Collins, 937 F.2d 131 (5th Cir. 1991). Petitioner was not clear and unequivocal that he demanded to represent himself rather than merely remove his current attorneys, and the Fifth Circuit has in Burton (and cases cited therein) distinguished those settings. Petitioner's motion may have contained a fairly clear request "to proceed pro se," but Petitioner's failure to make a similar demand at the hearing must also be considered. Consideration of the entire record relevant to this issue shows that the state courts were not objectively unreasonable in their resolution of the issue.

Furthermore, Section 2254(d) permits habeas relief on such an issue only when the state court decision runs afoul of "clearly established Federal law, as determined by the Supreme Court of the United States." Faretta recognized the right of self-representation at

*trial*, but <u>Martinez v. Court of Appeal</u>, 120 S.Ct. 684 (2000) held that there is no such right on *appeal*. The Court noted that the rights of the accused in "all criminal prosecutions" protected by the Sixth Amendment do not include the right to appeal, which is purely a creature of statute. Also important was that the status of the accused, who has a presumption of innocence during trial, changes dramatically once a guilty verdict is returned. Considering those rationales for distinguishing the right of self-representation at trial from appeal, there is at least a substantial question as to whether <u>Faretta</u> would extend to the litigation of a post-conviction motion for new trial (a creature of statute like an appeal) and after the presumption of innocence has been trumped by a guilty verdict. The state courts did not, therefore, act contrary to or unreasonably apply "clearly established" Supreme Court precedent as required to permit habeas relief.

**Issues 14, 15 and 19: Motion for New Trial; Ineffective Assistance**

Petitioner's motion for new trial included an assertion that jurors possessed and discussed newspaper articles that included information about Petitioner's prior conviction. Petitioner complains to this court that the motion was wrongfully denied, that the state court denied his right to compulsory process to obtain witnesses at the hearing, and that his counsel was ineffective.

The motion for new trial (Tr. 586) included an allegation that jurors Jody Blackwell, Joshua McCollum and Helen Gaines were exposed to the newspaper article that included information that Petitioner had pleaded guilty to attempted murder of a police officer and was

on parole when he shot Warren Smith. A supplemental motion (Tr. 598) added allegations that the prior conviction was discussed by jurors in the jury room.

The district court held a number of hearings on various aspects of the motion for new trial, but the evidence relevant to these issues was received on February 19, 1998. Tr. 1653. Petitioner had represented in a motion that a Ms. Judy Webb was told by juror Colby Thomas that jurors had discussed two newspaper articles about the prior conviction and that Thomas would provide an affidavit to that effect. Petitioner contends that Thomas signed the affidavit, but Ms. Webb never sent it to Petitioner because she was threatened by the prosecution and her employer.

Colby Thomas testified at the hearing that there was no newspaper in the room during deliberations, but a juror did have a paper on a prior day. He recalled that the juror was thumbing through the paper and commented, "This is the section that he told us not to read." Someone was called, and "they" (presumably the bailiff) took that part of the paper. Tr. 1665. Thomas also recalled that as the juror with the paper reached the "Local and State" section, it was another juror who said something like, "Don't read it because it might have something to do with the case inside this particular part." No one said anything about the article. Tr. 1667. Thomas, in response to several specific questions, denied ever speaking to Judy Webb or anyone else or agreeing to provide an affidavit about newspaper articles in the jury room. He did not recall any mention by a juror or other person about Petitioner's criminal history. Tr. 1668-69. The alleged affidavit was never produced.

Katie Bell, another juror who Petitioner claimed would support his motion, did not appear because she was excused due to illness. The attorneys spoke to her by telephone and stipulated to the substance of her testimony. She saw no newspapers in the jury room, and all deliberations concerned evidence presented at the trial. Nothing about Petitioner's criminal record was brought to her attention. She denied that she had been contacted about any improprieties in the jury room other than via a letter from Petitioner and the prosecution. Tr. 1711-12.

When Judy Webb received a subpoena for the hearing, she contacted defense counsel and said she had no information about the case. She signed an affidavit that she had "absolutely no knowledge at all" concerning the trial, the identity of the jurors, or the jury's deliberations. She did not testify at the hearing.

Counsel entered into a stipulation as to statements made by Essie Caldwell during a telephone conversation. She said that Judy Webb told her that Colby Thomas had agreed to provide her an affidavit, but Webb had decided to claim she knew nothing about it because her boss (at the Shreveport Times) would fire her if she got involved. Caldwell said she had not been present at the courthouse on the 17th, a date Petitioner claimed he would have had her available to testify. Tr. 1672-74.

Petitioner testified, but he had no firsthand knowledge from jurors.[5] He said that his niece, Elizabeth Dupree, spoke with Katie Bell, Colby Thomas and Judy Webb, and that his

_____

[5]On cross-examination at the hearing on the motion, Petitioner admitted that he was convicted of second degree murder in Michigan in the 1970's, in addition to the Louisiana convictions for murder and attempted murder. Tr. 1691.

niece was the source of his information. He contended that Mr. Thomas was lying, although Thomas had voted to acquit Petitioner.[6] He also charged that his witnesses had a tendency to get "roughed up" or intimidated and change their mind. Petitioner offered speculation about juror Blackwell reading the article and communicating its contents to other jurors, but he based it on nothing more than his observations of the jurors in the courtroom. Tr. 1680-89. He said he did not subpoena his niece for the hearing because the prosecution had a "habit" of intimidating witnesses. Tr. 1693.

Petitioner's niece, Elizabeth Dupree, attended the hearing nonetheless. She testified that she did not attend the trial. When contacted by defense counsel and asked if she knew about someone having a newspaper in the jury room, she said all of her information came from her uncle, Petitioner. She later spoke to Colby Thomas, who denied talking to a woman named Judy or providing a signed statement. He also denied seeing a newspaper in the jury room or talking about anything other than the trial evidence. Dupree telephoned Katie Bell, but Bell gave no information and said she did not want to get involved. Tr. 1705-07.

Dupree testified that she spoke to Judy Webb on the telephone, and Webb told her that she had a statement from Colby Thomas that she would have notarized. Webb said she would send the original to Petitioner and a copy to Dupree, but Dupree received nothing. Dupree said she later heard that, when Webb took the statement to get it notarized at her

---

[6] Louisiana allows a second degree murder conviction on a vote of 10 of 12 jurors. The vote in this case was 10-2.

place of employment, Webb's boss told Webb that she could lose her job if she pursued the matter.  Tr. 1707-08.

The trial court denied the motion for new trial.  The state appellate court conducted an exhaustive review of the relevant evidence and law at pages 19-30 of its opinion and affirmed that decision.  Factual findings by state courts on such issues, which turn largely on credibility assessments, may not be the basis of habeas relief unless they were "based on an unreasonable determination of the facts in light of the evidence presented" in the State court proceeding.  Section 2254(d)(2).  The state courts were quite reasonable to determine, based on the record described above, that Petitioner was not entitled to a new trial.

Petitioner complains that his Sixth Amendment right to have compulsory process was violated when the court did not require all of the witnesses he desired to be present for the hearing.  The state appellate court found that Petitioner failed to subpoena Essie Caldwell, and it appears that the trial judge acted well within his discretion to excuse the live presence of Katie Bell based on her illness.  Judy Webb swore that she had no additional information to offer, and Petitioner has never produced evidence to the contrary.  There is no basis for habeas relief established with respect to these issues.  Furthermore, it is questionable whether the right to compulsory process would apply at a hearing on a post-conviction motion.  The Supreme Court said in <u>Martinez</u> that Sixth Amendment rights enjoyed in "all criminal prosecutions" are "presented strictly as rights that are available in preparation for trial and at the trial itself."  120 S.Ct. at 690.

Petitioner complains in Issue 19 that his attorney was ineffective at the hearing because of his "conflict and hatred" for Petitioner. Every action by counsel, such as the stipulation to statements from absent witnesses, is said to be wrong. The state appellate court recited the lengthy history of Petitioner's many appointed attorneys and the several "outlandish allegations" Petitioner had made about them. The constant complaints of collusion and conspiracy ultimately resulted in Petitioner being permitted to represent himself on direct appeal. Petitioner's "paranoid and unproven accusations against each and every lawyer appointed to represent him" were found to be without merit. After reviewing the record, the undersigned cannot say that the state court's decision was contrary to or an unreasonable application of the principles of <u>Strickland v. Washington</u>, 104 S.Ct. 2052 (1984). <u>See</u> <u>Williams v. Taylor</u>, 120 S.Ct. 1495 (2000).

**Issue 17: Denial of Remand**

Petitioner complains the state appellate court violated his rights to due process and equal protection when it refused to grant his motion to remand the case to the trial court to hear his *supplemental* motion for new trial based on allegedly newly discovered evidence. Petitioner does not explain how the denial violates a principle of federal law clearly established by Supreme Court precedent so as to merit habeas relief. Rather, he merely complains that the motion for remand met the criteria of state law and complains (conclusorily) that the court's "unequal treatment" regarding his motion violates his constitutional rights. Petitioner has not presented sufficient facts or Supreme Court precedent to warrant habeas relief on this issue.

**Conclusion**

All issues properly raised in the habeas petition have now been addressed. None was found to warrant habeas relief from Petitioner's second degree murder conviction.

Accordingly;

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **DENIED**, and that Petitioner's complaint be **DISMISSED WITH PREJUDICE.**

<u>**Objections**</u>

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See <u>Douglass v. U.S.A.A.</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this 1st day of December, 2005.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE